UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

———

No. 6:20-cv-00589

———

**Snubco Pressure Control Ltd.,**
*Plaintiff,*

v.

**Dirk Lee et al.,**
*Defendants.*

———

# MEMORANDUM OF DECISION

This case alleges breach of a contract governing a business separation. An oilfield-services company headquartered in Canada sold its U.S. operations to new owners, including two key U.S. employees. To hedge against the new owners quickly flipping the U.S. business at a much greater valuation, the selling company retained a contingent financial stake in the proceeds of any such change in control of the U.S. business within a certain time.

That stake was 10% for the first four years, then 5% for the next two years. After those six years—time for the new owners' skill and contributions to predominate—the Canadian company's stake expired. Its financial stake was also contingent on the U.S. business being valued, in any qualifying deal, above a certain dollar threshold (a fair market value of $15 million). And the contract required written notice of any such sale.

The Canadian company now alleges that two transactions triggered its contingent financial stake and that defendants breached the contract by failing to pay and failing to supply information about the transactions. Doc. 28 at 9–10. After a bench trial, the court now issues its findings of facts and conclusions of law.

# TABLE OF CONTENTS

I.   Findings of fact ........................................................3

   A.   Standards for fact-finding ..................................3

   B.   The July 2015 Separation Agreement ................................3

   C.   The first disputed transaction............................................8

      1.   The July 2015 letter of intent ..................................... 9

      2.   The November 2015 transaction ............................... 11

         a.   The Unit Consideration ...................................... 11

         b.   The Cash Consideration ..................................... 13

      3.   The 2016 accountant's report on the transaction ....... 16

      4.   The 2016 demand letter seeking information ............. 19

      5.   Ultimate findings as to breach of contract ................. 20

   D.   The second disputed transaction .....................................26

      1.   Events leading to the 2018 transaction .......................26

      2.   The 2018 transaction ................................................ 28

      3.   Events after the 2018 transaction ............................... 31

      4.   Contractual definition of a "Change of Control" .......32

      5.   Ultimate findings as to breach of contract .................33

II.  Conclusions of law ..............................................................37

## I. Findings of fact

### A. Standards for fact-finding

After a bench trial, a court must "find the facts specially and state its conclusions of law." Fed. R. Civ. P. 52(a)(1). In finding facts, the court may draw reasonable inferences from the evidence, including inferences about stock valuation. *See, e.g.*, *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972) (so noting as to stock value). The court may also rely on inferences from the demeanor and potential bias of witnesses. Fed. R. Civ. P. 52 adv. comm. n. (1985).

In this civil trial, plaintiff bears the burden to establish, by a preponderance of the evidence, the facts necessary for recovery on its claims of breach of contract. The court's conclusions of law recite the showings that plaintiff must make. In this memorandum, "PX" denotes a plaintiff's exhibit, "DX" denotes a defendants' exhibit, "Tr.1" denotes the October 16, 2023 trial transcript, and "Tr.2" denotes the October 17, 2023 trial transcript. All monetary references are to U.S. dollars.

### B. The July 2015 Separation Agreement

The separating business here was an oilfield-services company named "Snubco"—a portmanteau of "snubbing" and "company." PX1. "Snubbing" is the use of specialized equipment to control oil and gas wells under pressure. Tr.1 at 30, 240.

The business was founded in Canada in 1996 by a group including John Taskinen, who is still its president. *Id.* at 30, 31. That company organized as Snubco Group Inc. under the laws of Alberta, Canada. PX1 at 1. Consistent with the Separation Agreement, the court refers to that entity as "Snubco Canada."

Snubco Canada grew and began to take on international work, including work in the United States. Tr.1 at 31–32. Through that work, Taskinen met Troy Campbell and, separately, Dirk Lee and Jody Kindred. *Id.* at 32. They grew the U.S. snubbing business, which was organized under Nevada law as Snubco Group USA,

Inc. and was wholly owned by Snubco Canada. *Id.* at 32–33; PX1 at 1. Consistent with the Separation Agreement, the court refers to that entity as "Snubco USA."

As Snubco USA began operations, Snubco Canada shipped it equipment worth over $1 million and supplied it with technical, policy, and safety support. Tr.1 at 33–34. In contrast, Lee and Kindred put in the lion's share of the labor and talent to start Snubco USA. *Id.* at 35. At some point, Campbell also became involved with Snubco's U.S. business. *Id.* at 37.

Snubco Canada did not provide all of the equipment used by Snubco USA. Because Snubco Canada was unable or unwilling to pursue loans for at least some equipment, Dirk Lee and Jody Kindred started and owned a separate company (DJOT, LLC) that borrowed funds to purchase and build snubbing equipment, which their company then leased to Snubco USA for its operations. Tr.2 at 30, 64, 124–25. Troy Campbell also started a separate company (TWC Group Operations, LLC) that owned snubbing equipment leased to Snubco USA for its business. *Id.* at 31, 126; *see, e.g.*, PX8 at Schedule 6.

By early 2015, Snubco Canada was in talks for Campbell, Lee, and Kindred to take over and run the U.S. business. Tr.1 at 36–37. On June 17, 2015, after negotiations through sophisticated counsel, a contract effectuating the deal was executed—the Separation Plan and Agreement ("Separation Agreement"). PX1 at 1; DX1 at 1. The Separation Agreement is governed by the laws of Canada and of the Province of Alberta. PX1 at 11.

The Separation Agreement provided for the transfer of Snubco USA's equity to the new "US Shareholder Group," defined as Lee, Kindred, and Campbell Family Trust No. 4. PX1 at 23. Defendants do not dispute that Troy Campbell is liable, as trustee of that trust, for any obligations of the trust as party to the agreement. *See id.* at 15. So the remainder of this decision treats the trust and its trustee (defendant Campbell) interchangeably, without further notation of any substitution. It also uses "defendants" to mean Lee, Kindred, and Campbell except as noted.

Under the Separation Agreement, defendants agreed to pay about $4.5 million to acquire all of Snubco USA's equity, and Snubco USA agreed to satisfy all of its debts to Snubco Canada. PX1 at 1–2, 26. Even then, Taskinen thought that Snubco Canada was getting less than the fair market value of Snubco USA. Tr.1 at 36. So the Separation Agreement also gave Snubco Canada a contingent financial stake in the proceeds of any qualifying sale of Snubco USA, or a qualifying change in its control, in the next six years. PX1 at 5. Snubco Canada would not have agreed to the deal without that provision. Tr.1 at 40–41.

That contingent financial interest is created in § 4.1 of the Separation Agreement, which reads in pertinent part:

**4.1 Proceeds of a Sale**. The parties agree that:

(a)  Snubco Canada will be entitled to ten percent (10%) of the Net Proceeds of a Sale, if a binding agreement in respect of such Sale is entered into prior to March 13, 2019, such amount to be paid within 90 days after receipt of the Net Proceeds by the US Group, or any of them, except that, if any portion of the Net Proceeds are deferred or contingent, then 10% of the portion of such Net Proceeds which has been deferred or is contingent will be paid as and when the deferred portion of the Net Proceeds are received by the US Group, or any of them.

(b) Snubco Canada will be entitled to five percent (5%) of the Net Proceeds of a Sale, if a binding agreement in respect of such Sale is entered into on or after March 13, 2019 and prior to March 13, 2021, such amount to be paid within 90 days after the receipt of the Net Proceeds by the US Group, or any of them, except that, if any portion of the Net Proceeds are deferred or contingent, then 10% of the portion of such Net Proceeds which has been deferred or is contingent will be paid as and when the deferred portion of the Net Proceeds are received by the US Group, or any of them.

PX1 at 5. The contract defines the "US Group" to include each of the "US Shareholder Group" (the defendants here). *Id.* at 23.

As shown, the 10% or 5% financial stake is contingent on three things: (1) a "Sale" occurring, (2) before the relevant date, and (3) "Net Proceeds" existing from that Sale. Each requirement is explained below.

**1.** First, a "Sale" itself has two components under the contract:

> "<u>Sale</u>" means a transaction [1] resulting in a Snubco USA Change of Control [2] in which Snubco USA, as a whole, is valued on a fair market value basis at an amount greater than $15,000,000.

> For the purposes of clarity, the amount of $15,000,000 referred to above is calculated prior to subtracting any fees and expenses associated with the transaction or any Indebtedness.

*Id.* at 21 (brackets added). As to the first element, a "Snubco USA Change of Control" is defined separately, *id.* at 22, and discussed later in this decision.

As to the second element, requiring a $15 million valuation, three points bear emphasis:

- First, this element requires only that Snubco USA "as a whole" is valued above that threshold in a transaction. *Id.* at 21. It does not require, more stringently, that the mere subset of Snubco USA equity that changes hands in a deal be valued above that threshold. For example, if 25% of Snubco USA's equity was sold for $10 million, in a transaction that valued Snubco USA "as a whole" at $40 million, the valuation threshold would be satisfied.

- Second, this element turns on how Snubco USA is valued "in" a qualifying transaction. *Id.* The contract does not turn on how a court, auditor, or other third party might later choose, independently, to assign a value to Snubco.

- Third, this element looks to valuation on "a fair market value basis" before "subtracting . . . any Indebtedness" of the company. *Id.* That measure comports with the parties' negotiations, which referred to the calculation as determining "enterprise value." *E.g.*, PX5 at 2. Enterprise value is the total market value of a company's equity plus the net amount of any debt used to finance the company—i.e., the sum of all financial claims against the company, whether equity or debt. *See, e.g.*, PX7 at 2–3 (presenting $20 million "enterprise value" as $18.6 million of total consideration for all of the company's shares plus $1.4 million of company debt); PX37 at 8 (presenting $40 million "enterprise value" as $35.8 million of total equity value plus $4.2 million of total indebtedness); Tr.1 at 118 (expert testimony that "enterprise value" is the number of shares times the market price for each share, if the company has no debt).

2. The second contingency for the § 4.1 interest is that any "Sale" must be entered into before the relevant four-year or six-year deadline. PX1 at 5. That time limit, along with the financial interest decreasing over time from 10% to 5%, explains why the relevant percentage is applied against the entire Net Proceeds from a qualifying "Sale" without any further attempt to equitably apportion those proceeds between the original efforts of Snubco Canada and later efforts of Snubco USA's operators. An equitable apportionment is already reflected in the percentage's decrease over time and expiration after six years.

3. The third and final contingency for the § 4.1 interest is the existence of "Net Proceeds" from a qualifying Sale. That term is defined as follows:

> "Net Proceeds" means any portion of the purchase price or consideration of a Sale delivered to the US Group, after payment of any Indebtedness in connection with such Sale, less any reasonable expenses of the Sale, including reasonable attorneys' fees and reasonable investment banking fees. If the consideration is non-cash, the Net

Proceeds shall nevertheless be paid in cash based on the fair market value of such non-cash consideration.

*Id.* at 20–21.

As shown, "Net Proceeds" are only the portion of the "purchase price or consideration" in a Sale that defendants or other US Group members received. For example, if Snubco USA as a whole was valued at $40 million in a qualifying "Sale," but the US Group received only $10 million for transferring a partial stake in Snubco USA, the § 4.1 interest would be calculated against only the $10 million of "Net Proceeds."

* * *

Two auxiliary obligations were also imposed. First, § 4.1(c) of the Separation Agreement required prompt, written notice to Snubco Canada upon "occurrence of any of the events constituting a 'Sale.'" *Id.* at 5. Second, § 6.7 required defendants to "take such actions as [Snubco Canada] may reasonably request to effect the contributions, distribution and exchanges, each as contemplated hereby." *Id.* at 11.

In this lawsuit, plaintiff alleges that all three contractual obligations were breached—that defendants failed to give written notice of a Change of Control that qualified as a Sale, failed to deliver all reasonably requested information about such a transaction, and failed to pay the required percentage of the Net Proceeds of such a Sale. Doc. 28 at 9. Plaintiff claims a breach of those obligations as to two transactions, one in 2015 and one in 2018. *Id.*

Findings of fact about each transaction are made below. Because those remaining facts of the case center on post-separation transactions involving Snubco USA, the rest of the court's decision refers to Snubco USA simply as "Snubco" for brevity.

### C.  The first disputed transaction

The first disputed transaction occurred in November 2015 and is addressed in this Part C. Facts going back to July 2015 negotiations, as found in subpart C.1 below, provide context.

The consummation of the transaction is explained below in subpart C.2. In subpart C.3, the court makes findings about an accountant's report subsequently describing the transaction.

Subpart C.4 makes findings about plaintiff's awareness of the deal and request for information about it. In subpart C.5, the court then reaches its ultimate findings of fact about defendants' alleged nonperformance of contractual duties.

### 1. The July 2015 letter of intent

First Reserve Momentum was a private-equity firm in Houston with a managing director named Logan Walters. Tr.1 at 81. In July 2015, five weeks after the Separation Agreement, First Reserve Momentum sent defendants a letter of intent, starting or reflecting negotiations to acquire Snubco. PX7; Tr.1 at 89–90, 130.

Under that proposal, all of the equity in Snubco would be transferred from defendants to a holding company given the placeholder name "Newco." PX7 at 1. That holding company would then issue ownership shares in different proportions to investor First Reserve Momentum ("FRM" in the letter) and to defendants ("Sellers" in the letter). *Id.* at 2, 5. Different share types would partake in a distribution of profits based on defined contingencies and amounts (the "waterfall"). *Id.* at 6–8. Defendants could sell their Newco shares only to FRM within five years but to any member of the public thereafter, subject to FRM's right of first refusal. *Id.* at 9.

In addition to that indirect equity stake in Snubco (defined as the "Equity Consideration"), the letter offered "Cash Consideration" in different forms, subject to adjustment based on Snubco's working capital at closing and any liabilities remaining at closing. *Id.* at 2–3. The letter stated that defendants would receive $13.1 million total in cash consideration and that third-party debt holders would receive $1.4 million. *Id.* at 3. The proposal did not require defendants to transfer DJOT's or TWC's equipment, which Snubco leased, or to sell those separate companies. *Id.* at 1–2; *see* Tr.2 at 126–27.

- 9 -

The letter of intent assigned defendants' "Equity Consideration" a value of $5.5 million, identifying that as 35.48% of the value of all Series A-1 units. PX7 at 2. In total, the letter stated a value of the consideration as $20 million ($5.5 million in equity consideration and $14.5 million in cash consideration), reciting that consideration as "based on an enterprise value of the Company of US$20.0 million." *Id.* The letter explains that the enterprise value was offered based on certain financial deliverables: "The Enterprise Value is predicated upon the Company's delivery of US$8.0 million to US$10.0 million of EBITDA for the Company's [Fiscal Year Ending] 2014, after appropriate consolidations and eliminations, in accordance with U.S. [Generally Accepted Accounting Principles]." *Id.* at 5; *accord id.* (explaining that the next fiscal year's expected EBITDA would be between $4 million and $5 million).

The term "EBITDA" in that document stands for earnings before interest, taxes, depreciation, and amortization, a measure of a company's profitability that removes financial factors that do not necessarily reflect the day-to-day soundness of the business. Tr.1 at 126. That measure of earnings is common in business valuation. *Id.*; *e.g.*, PX39 at 1. Also widely used in business valuation is the ratio of a company's enterprise value to that earnings figure, expressed as an EBITDA multiple. *E.g.*, PX39 at 24; PX40 at 6; Tr.1 at 125–27.

After Walters sent the letter on July 24, 2015, a Snubco officer emailed the company's accountant, stating that "Dirk and Jody are signing an LOI with a P/E group out of Houston." PX44. Such a countersigned letter of intent is not in evidence. But the court need not find whether any defendant signed it because that discrete fact would have minimal probative force. The letter, even if countersigned by defendants, would only bind them to a period of confidentiality and exclusivity in negotiations. PX7 at 1–2, 9–10. The enterprise value and consideration proposed in the letter would still be open for negotiation.

### 2. The November 2015 transaction

After sending the letter of intent in July 2015, Walters remained in touch with defendants about a deal. An agreement for Snubco's sale was ultimately signed. Tr.1 at 108, 112. It was consummated in two documents of importance here, signed on November 25, 2015:

    i.  a Contribution Agreement between defendants and a company newly formed to hold Snubco's stock, PX2; and

    ii.  an Amended and Restated Limited Liability Company Agreement of that holding company, DX6.

The consummated deal looks much like the July letter of intent. In the consummated deal, the generic "Newco" in the letter of intent is replaced by a real company: Momentum Pressure Control, LLC ("MPC"). *Id.* Walters was the president of MPC, which was formed nine days before closing to hold Snubco's stock. PX2 at 63; DX6 at 1, 83.

In the transaction, defendants would "contribute" (i.e., transfer) their 100% equity in Snubco to MPC in exchange for both equity in MPC, to be governed by its amended LLC agreement (the "Unit Consideration"), and stated cash consideration subject to potential post-closing adjustment (the "Cash Consideration"). PX2 at 20–22. Each is explained below.

### a. The Unit Consideration

In the deal, the parties agreed to an Amended and Restated Limited Liability Company Agreement (the "LLC Agreement") defining their rights as owners of equity in MPC. DX6.

Under the LLC Agreement, MPC was authorized to issue four types of membership interests: Series A-1 and A-2 units as "Capital Units" (to reflect an agreed amount of capital investments) and Series B and C units to vest pursuant to equity-grant agreements (akin to incentive stock awards). *Id.* at 8–9.

The "Sponsor" in the deal was Momentum Pressure Control *Holdings*, LLC, a separate company that managed the private

investor's capital. *Id.* at 100; DX2 at 41. Specifically, Momentum Pressure Control Holdings was backed by private-equity firm Energy Growth Momentum ("EGM" or sometimes "EGI"). PX4 at 32; Tr.2 at 74. On the other side of the table, the "Founders" in the deal were defendants Campbell, Lee, and Kindred. DX6 at 93.

A total of 161,150 Series A-1 units were authorized. *Id.* at 8. Of those, 105,000 were issued to private-equity sponsor MPC Holdings in exchange for a $10.5 million capital contribution to MPC. *Id.* at 6. That capital contribution was in fact paid when the deal closed. Tr.2 at 59, 70.

The remaining 56,150 Series A-1 units were issued to defendants as Unit Consideration, part of their overall consideration for transferring Snubco's stock. DX6 at 6, 11. The LLC Agreement divided the units among the parties according to Schedule I, *id.* at 11, deeming the amounts below as their capital contributions:

| Name | Agreed Value | Series A-1 Units |
|------|-------------|------------------|
| MPC Holdings | $10,500,000 | 105,000 |
| Campbell | $1,572,200 | 15,722 |
| Lee | $2,021,400 | 20,214 |
| Kindred | $2,021,400 | 20,214 |
| Total | $16,115,000 | 161,150 |

*See id.* at 117 (reformatted and edited for simplicity). The total agreed value for the capital contribution assigned to defendants' 56,150 Series A-1 units is $5.615 million.

The initial capital contribution assigned in Schedule I plugs into the definition of each unit holder's entitlement to any distribution of profits or proceeds by MPC. A series of cascading provisions in the LLC Agreement define that metaphorical distribution waterfall. *Id.* at 22–27. Series A units (A-1 or A-2) entitle the holders to receive the first 100% of distributions until the holders' agreed capital contributions are repaid. *Id.* at 23. After repayment of the agreed capital contributions, any further distributions would be allocated on a percentage basis among all Series A, B, and C unit holders. *Id.* Based on the authorized quantities and

definitions in the LLC Agreement, Series A unit holders would still receive a large share of those future distributions. *Id.* at 9, 11, 99–100.

Those further distributions would be received by defendants, not only as Series A unit holders, but also as holders of Series B units. *Id.* at 11 (cross-referencing Schedule II). Under the LLC Agreement, defendants received the same number of Series B units as they did Series A-1 units (15,722 for Campbell; 20,214 for each of Lee and Kindred). *Id.* at 11, 118. Any distributions after agreed capital contributions were repaid would thus flow to defendants based on at least two types of MPC units.

The LLC Agreement also allows, but does not require, the private-equity sponsor to contribute up to another $10.5 million in capital when called upon and to then receive commensurate additional Series A units. *Id.* at 16–22. Defendants also had certain restrictions on disposing of their units within five years. *Id.* at 32–48. And MPC's board of managers was controlled by the private-equity sponsor. *Id.* at 48–49.

### b. *The Cash Consideration*

Under the contract, a two-step process governed the determination and delivery of defendants' cash consideration. PX2 at 20–24; *see* Tr.1 at 107. That process involved a series of calculations resulting in an initial cash transfer based on estimates of Snubco's working capital and indebtedness as of the closing date, followed by potential adjustment of that amount based on a final examination of Snubco's books as of the closing date. PX2 at 20–24.

First, at closing, the "Preliminary Cash Consideration" would be paid. *Id.* at 24 § 2.3(c)(i). That was defined as follows:

(a) the Base Cash Consideration [defined as $4,185,000]

(b) plus the amount (if any) by which the Estimated Closing Working Capital [determined near closing] exceeds the Target Working Capital [defined as $2,500,000],

(c) minus the amount (if any) by which the Target Working Capital exceeds the Estimated Working Capital,

(d) minus the Working Capital Holdback Amount [$250,000],

(e) minus the Indemnity Escrow Amount [$1,000,000] and

(f) minus the Closing Date Indebtedness.

*Id.* at 16 (emphases omitted; line breaks added); *see id.* at 7, 17, 18.

Subsections (b)–(d) implicate the post-closing adjustment process for working capital described below. Subsection (e) concerns a holdback to satisfy any indemnity owed by defendants to MPC. A separate agreement governs the escrow of that amount, to be released to defendants on or after closing if not claimed against. *Id.* at 23. Subsection (f) refers to Snubco's total indebtedness on the closing date, *id.* at 8, which Snubco had to arrange to pay off to ensure that Snubco was transferred free of debts and liens. *Id.* at 20; Tr.2 at 130:16. The base cash consideration of $4.185 million would be used to pay off the closing-date indebtedness, so defendants' preliminary cash consideration was reduced in that amount. PX2 at 16; *accord id.* at 47 § 7.2(a)(iv) (indemnity owed by defendants if preliminary cash consideration not used to pay off closing-date indebtedness).

Before closing, defendants had to apply that definition to their best estimate of Snubco's financial position by delivering an "Estimated Closing Statement" with three categories of information:

(i) an estimate of Snubco's working capital and indebtedness as of the date of closing;

(ii) a resulting calculation of the Preliminary Cash Consideration, along with how it would be distributed to each defendant and to any creditor; and

(iii) appropriate indebtedness pay-off letters.

*Id.* at 20 § 2.1(b) (numbering in original). At closing, MPC would then deliver the stated Preliminary Cash Consideration. *Id.* at 24 § 2.3(c)(i).

Second, within 90 days after closing, MPC would calculate Snubco's actual Closing Working Capital. *Id.* at 21; *see id.* at 18 (defining "Working Capital" to mean current assets minus current liabilities, excluding any closing-date indebtedness and

deferred tax liabilities). After a defined process to resolve any disputes over that amount, the actual and estimated Closing Working Capital would be compared. *Id.* at 21–22. If the actual amount exceeded the estimated amount, MPC would wire to defendants the difference and release to them the $250,000 holdback. *Id.* On the other hand, if the actual amount was less than estimated, MPC would take the difference out of the $250,000 holdback before releasing it, and defendants would pay MPC any remaining amount needed to make up the difference. *Id.* The result of that post-closing adjustment would be the final "Cash Consideration." *Id.* at 20.

Consistent with § 2.1, defendants delivered before closing an Estimated Closing Statement. PX15. As to category (i) above, it estimated Snubco's closing working capital at $3,000,000, which was $500,000 more than the target working capital. *Id.* Defendants estimated the closing-date debt at $1,565,759.76. *Id.*

As to category (ii) above, defendants calculated the Preliminary Cash Consideration as follows:

|   | Base Consideration | $4,185,000 |
|---|---|---|
| + | Working Capital Target excess (est.) | $500,000 |
| - | Working Capital Target deficit (est.) | $0 |
| - | Working Capital Holdback | $250,000 |
| - | Indemnity Escrow | $1,000,000 |
| - | Closing Date Indebtedness | $1,565,760 |
| = | Preliminary Cash Consideration | $1,869,240 |

*See id.* § 2.1(ii) (court's labels; numbers rounded). That calculation correctly applies the contract's definition to the figures provided in the estimated closing statement.

As to category (iii) above, defendants stated that a payoff letter was attached, but the document itself does not expressly state to whom the $1,565,760 of indebtedness was owed. *Id.* § 2.1(iii). No evidence supports a finding as to the identity of the creditors on that debt. But the court infers that defendants, if they were not

the creditors themselves, had guaranteed that debt personally because the parties characterized repayment of that debt as consideration received by defendants. *Id.*; PX2 at 16, 20.

The closing statement shows that Campbell received a much larger portion of the preliminary cash consideration than did Lee and Kindred. Lee and Kindred were each 25% owners of Snubco's equity, with Campbell owning 50%. *See* Tr.2 at 12; PX15 (reflecting such a split on most line items). But compared to that baseline, the closing statement allocates Campbell a higher percentage of the base cash consideration while giving him a lower percentage of the equity consideration. PX15. The court infers that Campbell elected to "cash out" to a larger degree by taking a relatively lesser equity stake in MPC but a relatively larger cash payment.

At closing, defendants received the stated cash consideration (cash wired to them and cash wired to satisfy any debt they guaranteed). An email summarizing that flow of funds indicates receipt of a $9.5 million wire. PX49. That perhaps represents MPC Holdings' $10.5 million capital contribution less the $1 million indemnity holdback.

That email's reference to a "Pay-down on the loan of $3,150,000" does leave the court questioning whether the exhibits and defendants' trial testimony reveal the whole story about Snubco's debt at closing, since the estimated closing statement refers only to $1,565,760 of debt. PX15. But plaintiff accepted that the estimated closing statement was the final closing statement. Tr.2 at 17. And no record evidence establishes, by a preponderance, that the closing-date indebtedness was otherwise. So the court finds that PX15 correctly represents the flow of funds and that the post-closing adjustment process did not result in any claim against the holdbacks.

### 3. The 2016 accountant's report on the transaction

After the deal closed, an accountant audited MPC's consolidated balance sheet as of the end of 2015. PX4 at 25–39. The

accountant reported that MPC's records showed the following consideration paid on the closing date:

| | |
|---|---|
| Cash | $ 3,685,000 |
| Escrow of cash | 1,000,000 |
| Equity instruments | 5,615,000 |
| | $ 10,300,000 |

*Id.* at 32. The total cash shown there (paid and escrowed) is $4,685,000. That is consistent with the closing statement just reviewed, which shows $4,185,000 of base cash consideration and $500,000 more in cash consideration for exceeding target working capital. PX15. The court accepts the $4,685,000 figure as the amount of the wire transfers made on account of the defined Cash Consideration.

In contrast, the $5,615,000 figure in the accountant's report merely shows an agreed book value of the equity units that defendants received (even then, just the Series A-1 units). That is not necessarily the same as the value that those equity units would fetch on the market based on the rights they convey. Even defendants recognized the difference. They signed an LLC Agreement whose provision about a certain forced sale of their MPC units draws a distinction between the $100 per unit agreed capital contribution and the "Fair Market Value" of the unit. DX6 at 35; *see id.* at 92–93 (giving a standard definition of fair market value); *see also id.* at 87-88 (defining "Book Value" for tax purposes).

The equity units in MPC were just rights, governed by a contract. The Series A-1 units collectively entitled their holders to 100% of MPC's distributions up to the agreed initial-capital-contribution amount of $16,115,000. But they also entitled their holders to share more broadly in the company's further distributions of profits and proceeds. So one cannot compute the fair market value of the defined bundle of rights by ignoring half of the bundle—the second half of the "waterfall."

The accountant's report likewise gives no indication that anyone performed an appraisal of the MPC units based on the rights

they conveyed: entitlement to streams of future income, in a contractually defined waterfall. The accountant simply reported the $5,615,000 amount of agreed initial capital contributions for defendants' Series A-1 units, without analyzing how the market would value the full set of rights that define the Series A-1 units. The accountant's report also fails entirely to account for defendants' receipt of Series B units.

The accountant's report then lists the assets and liabilities acquired in MPC's purchase of Snubco, such as inventory, accounts receivable, property, plant, and equipment, accounts payable, and deferred tax liabilities. PX4 at 32. The report provides an "estimated fair market value" for *those* assets, estimating each one's market value if the company's constituent parts were liquidated. *Id.*; Tr.2 at 181–82 (Lee's agreement that the audited financial sheet just shows that "one way of valuing the assets of the company," that being the result of a liquidation, as opposed to what a willing buyer would pay for "the company as a future going concern"). The net assets' liquidated value is around $9 million, which is unquestioned here.

The list then contains a residual category of "goodwill" to reflect "the specific workforce and business process advantages" allowing Snubco to combine its capital, property, plants, and equipment in a way creating profit—i.e., the intangible know-how, skill, and relationships that made Snubco a going business concern and not just a collection of assets. PX4 at 32. But the accountant did not independently appraise goodwill. Rather, the report explains that the accountant merely performed a subtraction: "The excess of the purchase price over the fair market value of the net assets acquired was allocated to goodwill." *Id.* So the accountant simply took the book value assigned to the total consideration paid ($10.3 million), subtracted the appraised fair market value of the net assets acquired (about $9 million), and arrived at a goodwill valuation (about $1.3 million). *Id.*

The probative force of that "goodwill" value as evidence of Snubco's fair market value is thus wholly dependent,

mathematically, on the probative force of the book value assigned to defendants' equity units as a measure of those units' fair market value. And, as just explained, no accountant purported to appraise those equity units' fair market value, which would need to account for *all* of the rights attached to the units, not just the first half of the distribution waterfall. The accountant's report thus does not support an inference that the fair market value of Snubco as an enterprise was $10.3 million or any other particular number.

### 4. The 2016 demand letter seeking information

Plaintiff's owner, Taskinen, first heard about the MPC transaction with Snubco in or after May 2016, six months after the deal. Tr.1 at 53. Someone told him about it, and he then read about it online. *Id.* Neither defendants nor any other Snubco representative gave plaintiff prompt, written notice of the deal. *Id.* at 54.

Taskinen then contacted defendants about what he had heard. *Id.* Defendants responded that the sale did not meet all requirements under the Separation Agreement to trigger the § 4.1 financial interest. *Id.* The court infers that defendants' initial response also provided at least portions of the Contribution Agreement, which plaintiff referenced in a June 2016 request for additional information. PX12 (response to request); *see* PX11 (cover email).

Defendants responded to that second request in July 2016. PX12. As to plaintiff's question about how the Contribution Agreement assigned a value of $5,615,000 to defendants' Series A-1 units, defendants pointed to the agreement's section stating that each of their 56,150 Series A-1 units "was issued at a value of $10[0] per Unit." *Id.* at 1. Apart from the typographical error, that response does answer plaintiff's first question, which was limited to how the Contribution Agreement worked.

More troubling is defendants' blanket denial of plaintiff's request for the LLC Agreement amended in the MPC deal. *Id.* at 2. Defendants simply wrote: "This agreement is not necessary for the purposes of your inquiry." *Id.* But the LLC Agreement defined the nature and extent of the MPC unit holders' rights—the

distribution waterfall. DX6. Withholding that agreement thus withheld key information about the nature of the equity consideration that defendants received in the deal. That information would have allowed Snubco Canada to satisfy itself about the fair market value of defendants' equity consideration.

### 5.  Ultimate findings as to breach of contract

The court now turns to whether the 2015 transaction triggered the § 4.1 contingent financial interest. That interest required a qualifying change-of-control transaction "in which" Snubco USA "as a whole" is "valued on a fair market value basis," before subtracting indebtedness, at an amount more than $15 million. PX1 at 21. As explained in the court's conclusions of law, that contract language calls for fact-finding as to the fair market value assigned to Snubco in a qualifying transaction. Fair market value refers to what a willing buyer and willing seller negotiating at arm's length would pay for the enterprise as a going concern. Only the value assigned by the parties in a qualifying transaction matters. The court's valuation opinion is immaterial.

**a.**  The fair market value assigned to Snubco in the deal equals, tautologically, the fair market value of the total consideration paid to defendants to acquire their 100% ownership of Snubco. One thing was exchanged for the other.

So the question becomes the value of everything that defendants got in the deal. The value of the cash consideration received by defendants is undisputedly $4.685 million. The key question is thus the fair market value of defendants' equity consideration. That took the form of Series A-1 units, Series B units, and execution of an LLC Agreement that defined rights regarding those units and a possibility of receiving further units (Series A-2 and Series C units).

The deal's closing statement and subsequent accountant's report discussed above state a $5.615 million valuation for the equity consideration. But the court has explained why it finds that number unreliable as a measure of fair market value. Even the LLC

Agreement in the deal distinguished the Series A-1 units' fair market value from the $100 per unit initial-capital-contribution amount, which marked only a threshold for broader sharing in the profits waterfall—not the termination of that waterfall. DX6 at 35. Both the closing statement and accountant's report also fail entirely to account for the Series B units received by defendants.

Yet that is a limited point: those documents do not contain a valuation analysis that shows a fair market value of the equity consideration received by defendants. That is simply an absence of proof. It is not proof of any specific valuation in the deal. Several possibilities still exist:

- The fair market value of defendants' waterfall rights under all of their units may have been right around the $5.6 million book value assigned to their Series A-1 units.

- The fair market value may have been under $5.6 million, with that amount merely being used as defendants' capital contribution for power-allocation or other reasons.

- The fair market value of defendants' equity units may have been more than $5.6 million but less than around $10.3 million, such that the fair market value of their total consideration for Snubco was still under $15 million.

- Or the fair market value of defendants' equity units may have been $10.4 million or more, making their total consideration for Snubco valued at over $15 million.

The truth of any one possibility simply is not proven by the closing statement and accountant's report, as they do not show a fair-market-value analysis of the rights that defendants received.

**b.** So those documents do not support defendants' position. But neither do they support plaintiff's position. Plaintiff tries to turn those documents to its favor by arguing that the $5.615 million shown on those documents should be divided by defendants' 35% share of MPC's total Series A-1 units to arrive at a fair market value for Snubco as a whole. That argument has two problems. First, the starting point is unreliable. As just explained, neither

document shows a fair-market-value analysis of the rights that defendants received in MPC.

Second, in any event, plaintiff's argument uses the wrong formula. Only the fair market value of the equity units and rights received by *defendants* can be added to the amount of cash consideration received by defendants to arrive at the fair market value of the total consideration received by defendants, in exchange for their 100% ownership of Snubco. Plaintiff's formula would also capture the equity units received by MPC Holdings in exchange for *its* large capital infusion. So plaintiff's attempt to turn the tables in this way does not work.

**c.**   At trial, Lee testified to his belief that the fair market value of Snubco was around $9 million. Tr.2 at 145. But Lee simply referenced the accountant's appraisal of Snubco's net assets, sold on a liquidation basis. *Id.* That is not an enterprise value of Snubco as a going business concern. Indeed, even the accountant's report included some amount for business "goodwill." So the court assigns no weight to Lee's valuation testimony.

**d.**   An EBITDA-multiple analysis held the most promise for plaintiff. But it ultimately does not carry the day for plaintiff because there is no reliable evidence of what EBITDA baseline or multiple was actually used in the consummated deal. And the contract's definition turns on the valuation assigned in the transaction itself.

To be sure, the July 2015 letter of intent signed by Walters assigned Snubco an enterprise value of $20 million, which was 4 to 5 times a slower year's expected EBITDA range of $5 million to $4 million and 2 to 2.5 times a stronger year's expected EBITDA range of $8 million to $10 million. PX7 at 2, 5. But that was just a non-binding starting point for negotiations. *Id.* at 9.

And things continued to change in 2015. The private-equity firm backing that proposal pulled out. Tr.1 at 128. The oil market suffered a downturn. PX40 at 16. Snubco had trouble borrowing money. Tr.2 at 64. And Snubco's balance sheet likely changed. For instance, the letter of intent's presentation of Snubco's debt to its

shareholders does not match the closing statement's presentation of Snubco's total debt. *Compare* PX7 *with* PX15.

Without testimony or documentation more closely tied to the consummated transaction, and showing an agreed EBITDA baseline and multiple used to establish Snubco's enterprise value, the court cannot infer that one figure or even one range was more likely used than another. For instance, if a multiple of 4.0 (cited in the letter of intent for 2015) was applied against earnings of $3.2 million (cited in a later report as MPC's EBITDA for 2015, PX40 at 16), the product is an enterprise value of only $12.8 million. That is less than the $15 million threshold.

**e.**  A final way of looking at the deal also leaves the court unable to find that Snubco as a whole was valued at more than $15 million on a fair-market-value basis. Instead of looking at what defendants gave up and what they got in exchange, one can look at what the sponsor in the deal (MPC Holdings) started and ended with.

Before the deal, MPC Holdings had $10.5 million in the bank. After the deal, it had given up the $10.5 million, transferring it to MPC. In exchange, MPC Holdings got 105,000 Series A-1 units in MPC (which held all of Snubco's stock), and an amended LLC Agreement governing the units and business control.

That transaction was negotiated at arm's length between disinterested parties in the marketplace. If a willing investor would truly value the Series A-1 units' right to receive future earnings at much more than $100 per share, then Snubco would be expected to have negotiated for a larger cash investment in exchange for granting those units to MPC Holdings. But, in reality MPC Holdings paid just $100 per unit. That transaction is strong evidence that each Series A-1 unit had a fair market value of around $100.

In fact, the fair market value of *defendants'* Series A-1 units was likely less than $100 per share because their units were not exactly like MPC Holdings' units. For one, defendants' Series A-1 units were restricted from public sale without permission for five years. Defendants' units were also held under an LLC Agreement

that gave majority voting control to MPC Holdings, not to defendants. Both features would tend to decrease those units' value.

At the same time, unlike MPC Holdings, defendants also received Series B units. That would increase the fair market value of the total equity consideration received by defendants. Any increase appears relatively small because distributions to Series B units would happen only later in MPC's lifespan. Defendants also received a contractual option to buy Series A-2 units if the sponsor first did and a contingent option to receive Series C incentive units. Those rights would also have some independent value, although the court infers that it would be much less than the other figures bouncing around because those rights were conditional.

Those differences between defendants' and MPC Holdings' equity rights preclude a finding that the fair market value of defendants' total equity consideration was exactly $5.615 million (calculated as 56,150 Series A-1 units at $100 per unit). But the court infers that the value of those distinguishing characteristics does not drastically outsize that amount because the Series A-1 units came first in, and all shared equally in, the profits waterfall. That would likely make them the predominant driver of the value of defendants' total equity consideration.

As such, plaintiff's valuation position would mean that defendants' Series A-1 units had a fair market value more than 75% higher than MPC Holdings paid for its own Series A-1 units on the same day, in an arm's length transaction. To spell that out, plaintiff's implied valuation of defendants' equity consideration is $15 million (at a minimum) minus the $4.685 million of defendants' cash consideration. The result is $10.315 million (minimum) of alleged value for defendants' equity consideration. If substantially all of that alleged value was for the 56,150 Series A-1 units received by defendants, those units' market value would be around $180 each. That is simply untenable given that MPC Holdings paid only $100 per unit on that same day.

So the court cannot find by a preponderance of the evidence that the total of (1) the $4.685 million in documented cash

- 24 -

consideration plus (2) whatever fair market value was in fact assigned to defendants' equity consideration (likely around $5.615 million but not exactly that amount) was (3) an amount exceeding $15 million. Unless defendants got millions more in cash consideration under the table or off the books, the more likely reality is that Snubco's fair market value was below $15 million. The court does harbor questions about what happened to the $5.4 million in debt owed by Snubco to defendants, as shown in the July 2015 letter of intent, between the time of that letter and the November 2015 deal closing. *See* PX7 at 3. But plaintiff had a full opportunity to take discovery from defendants. And plaintiff has not offered evidence allowing a finding that additional cash consideration, not shown on the closing statement, was paid off the books.

**f.** For all of those reasons, a preponderance of the evidence does not support a finding that Snubco was valued on a fair-market-value basis in the 2015 transaction at more than $15,000,000. Plaintiff has the burden of proof, and it has not carried that burden with the testimony and exhibits here.

Based on that finding, the 2015 transaction was not a "Sale" as defined in the Separation Agreement. So a § 4.1 contingent financial interest did not attach, nor did the § 4.1 duty to provide written notice. As such, plaintiff has not proven a breach of § 4.1 as to the 2015 transaction.

Plaintiff also alleges breach of § 6.7 of the agreement, which required defendants to take reasonably requested action to effectuate any distribution contemplated by the agreement. But the agreement contemplates a payment under § 4.1 only if a transaction meets the definition of a "Sale." And plaintiff has not shown that the 2015 transaction does. So the court does not find a breach of § 6.7. In any event, plaintiff points to no information allegedly withheld that plaintiff does not now have. So plaintiff would be in the same position as it is now, unable to prove entitlement to a § 4.1 payment. Given that finding, even the alleged breach of § 6.7 would not support an award of damages.

- 25 -

### D.  The second disputed transaction

The second disputed transaction occurred in May 2018 and is addressed in this Part D. The events before, during, and after the transaction are described in subparts D.1, D.2, and D.3. The relevant contract language is quoted in subpart D.4. The court's ultimate findings about performance of the contract's obligations are then made in subpart D.5.

### 1.  Events leading to the 2018 transaction

After the 2015 transaction discussed above, 100% of Snubco's equity was owned by MPC. That company's equity, in turn, was held by MPC Holdings (majority owner of the Series A-1 units) and by defendants (minority owner by the same measure). Voting power in MPC was aligned similarly, with most business decisions made by a three-member board of managers controlled by sponsor MPC Holdings' two designees. DX6 at 48–51 (describing board composition, designees, votes per manager, quorum, and required votes for board action).

After the 2015 transaction, MPC continued running Snubco's business, receiving any profits and dividends as 100% owner of Snubco's stock, and making any distribution of those proceeds to MPC's unit holders (defendants and MPC Holdings). Equity ownership and voting power in MPC did not change before the 2018 transaction. Its snubbing business operated under the name Snubco for a time, but it was publicly rebranded as MPC at some point. Tr.2 at 136. The business continued growing by expanding into new territories, adding equipment yards, and earning a higher price for its services. *Id.* at 134–35.

By early 2018, a large operator in the oilfield-service industry was looking at adding to its existing lines of business by acquiring MPC. That large operator was TEC Energy Services. PX8. Its majority owners were two private-equity firms out of Houston: Lime Rock Partners and B-29 Investments. Tr.1 at 195; PX40 at 5. Of the two, Lime Rock took the lead on working up and analyzing the business opportunity. Tr.1 at 192–96. On MPC's side, its sponsor

MPC Holdings was still represented by Walters, and defendants spoke for themselves. *See* PX37; Tr.1 at 189.

After Lime Rock's due diligence, it prepared a memo analyzing the investment opportunity. PX40; Tr.1 at 198–99. That memo helps understand the big picture and the valuation assigned in the final transaction to MPC's ownership of Snubco. The memo also confirms the history described above, albeit referring to Snubco as being "MPC" even before the 2015 MPC transaction:

- "Momentum Pressure Control is a rig-assist snubbing/pressure control service business headquartered in Longview, Texas (where TEC is also based)." PX40 at 1.

- "MPC (formerly known as SnubCo USA) was founded in 2012 and was originally part of a Canadian pressure control business . . . ." *Id.* at 13.

- "Over that time [2012 to 2014,] MPC performed extremely well generating cash flow that was used to finance the underperforming Canadian business," so the U.S. management team bought out the U.S. business. *Id.*

- "In 2015, MPC partnered with First Reserve Momentum (currently Energy Growth Momentum) to provide growth capital for the business in exchange for a ~70% equity stake." *Id.*

The memo then describes TEC's business "thesis" motivating a deal—achieving a "full package well service offering" consisting of MPC's snubbing-and-pressure-control business and TEC's "workover rig fleet." *Id.* at 2, 14, 39; *accord* Tr.1 at 232–33.

As to the form of an acquisition, Lime Rock established a holding company (TEC Energy Services, LLC) as a vehicle to hold TEC's existing workover business (TEC Well Service, LLC) and to acquire MPC and any other new businesses. PX40 at 5, 40. The memo aptly describes the proposed acquisition of MPC as a "recapitalization/merger." *Id.* at 16.

MPC's equity owners (defendants and MPC Holdings) would transfer their equity to the TEC holding company in exchange for

different types of consideration. On the one hand, MPC Holdings was getting out of the business and would "be cashed out for a total of $27.8 million." *Id.* at 5. By that point, MPC Holdings had exercised its right to contribute additional capital to MPC and thus had received Series A-2 units, giving it about 70% of the total Series A units in MPC. *See* PX8 at 20.

On the other hand, defendants were staying invested in the merged business, so their roughly 30% equity stake in MPC would be traded for a roughly 10% equity stake in the new TEC holding company. PX40 at 6. The exact nature and form of defendants' equity in the TEC holding company is not as important here as were similar details regarding the 2015 deal.

The Lime Rock memo then conducts a thorough valuation of MPC, reviewing its operations, competitors, history, growth prospects, potential synergies, and financials. *Id.* at 1–18. The memo finds that MPC's total enterprise value is $40 million, justifying that as sitting between 4.4 and 5.2 times various measures of its EBITDA. *Id.* at 7–8.

The memo explains that MPC was also forming a new, blow-out-preventer ("BOP") rental line of business, with that equipment "just now arriving." *Id.* at 1; *accord* Tr.2 at 134 (testimony about BOP-rental division). Because "the BOP rental service line [was then] currently being formed," it was treated separately and assigned a separate enterprise value of $2.7 million. PX40 at 5, 8.

### 2.    The 2018 transaction

The consummated transaction took a substantially similar form, with the $40 million enterprise value assigned to slightly different entities. PX3 (2018 Purchase and Contribution Agreement). The new TEC holding company received all of MPC's equity from its then-owners, including the MPC workers who had been granted a small number of Series C units. *Id.* at 9–10. In exchange, the MPC unit holders were paid either cash or equity consideration based on a defined "Enterprise Value" for MPC of $35,782,449. *Id.* at 80. Defendants' separately owned equipment-

rental companies (DJOT and TWC) were paid a total of $4,217,551 in exchange for listed equipment. PX8. The total of those two numbers is $40 million.

**a.** Because MPC Holdings was cashing out, it was the "Seller" and would receive, in exchange for its units, a defined cash payment subject to post-closing adjustment. PX3 at 11–19. The Series C unit holders were also cashed out at a defined amount, small enough to be irrelevant here. *Id.* at 12, 90.

The amount of MPC Holdings' cash consideration was also determined under a contractual formula. First, an "Estimated Equity Value" for MPC at closing was calculated by adjusting the $35.8 million enterprise value based on closing-date indebtedness, working capital, and startup costs. *Id.* at 81. That estimated equity value after those adjustments was $33,953,370. *Id.* at 90.

Second, that estimated total value of MPC's equity was apportioned to MPC Holdings according to a "Seller Equity Value Percentage" of 69.575%. *Id.* at 87–88. That was the percentage of Series A-1 and Series A-2 units then held by MPC Holdings. PX4 at 20. The resulting "Unadjusted Cash Purchase Price" was $23,622,935. PX3 at 88, 90.

Finally, that sum became a closing-date payment due to MPC Holdings after subtracting a $1 million break fee, certain escrow amounts, and a small amount to cash out the Series C unit holders. *Id.* at 78. Those adjustments resulted in a payment of about $19.9 million to MPC Holdings at closing, with about $2.7 million in escrow available for later release. *Id.* at 90.

**b.** Because defendants were staying invested in the merged businesses, they received equity in the TEC holding company in exchange for contributing their MPC equity. *Id.* at 12. As such, defendants were deemed "Contributors" in the deal. *Id.* They had to contribute the "Rollover Interests," defined as defendants' 56,150 Series A-1 units and 56,150 Series B units in MPC. *Id.* at 11; PX4 at 19 (Schedule 4.4(a)).

In exchange for transferring that equity in MPC, defendants collectively received 151,735.12 Class A units in the TEC holding

company, with each defendant's portion in the same percentage as were his MPC units. *Id.* at 11–12; PX4 at 10.

That total number of units in the TEC holding company was determined based on a defined formula. First, an "Unadjusted Equity Purchase Price" was calculated as the estimated equity value of MPC as a whole ($33,953,370, as noted above) times a contributor equity percentage of about 30%. PX3 at 79, 88, 90. The product was $10,330,313.

Second, a small amount was deducted from that value to represent defendants' share of the cost to cash out the old MPC Series C unit holders. *Id.* at 78. After that subtraction, the "Closing Date Purchase Equity Amount" assigned to defendants' new TEC equity was $10,292,071. That resulted in a per-unit value of $67.83. *Id.* The court accepts those figures as the total and per-unit fair market value assigned to defendants' equity consideration in the transaction. *Accord* PX37 at 9 (closing-date worksheet).

That value of defendants' new TEC equity ($10.3 million), together with the total cash payments to MPC Holdings ($19.9 million at closing plus $2.7 million in escrow) and the break fee ($1 million), comes to the stated $33.9 million estimated value of MPC's total equity. (The value of MPC's former Class C units is a rounding error when stating these values in millions.)

**c.** Lastly, the TEC holding company paid $1,060,467 to Lee's and Kindred's separate company (DJOT) and $3,157,084 to Campbell's separate company (TWC) to acquire listed equipment owned by each, which had been leased to Snubco. PX8 at 1–2 § 2(a); PX37 at 6; Tr.2 at 35–39. The total of those two payments plus MPC's agreed enterprise value is $40 million.

**d.** One exhibit may suggest that, at closing, the cash paid to acquire MPC's equity was over and above the cash consideration described above. A spreadsheet labeled "MPC/TEC Allocation of Indemnification" shows a payment to MPC Holdings' owner (EGI) that is larger than described above. PX37 at 10. *Id.* And it shows a cash payment to defendants totaling $368,896.74, *id.*, whereas the Contribution Agreement and estimated closing

statement do not show any cash payment to defendants, as noted above.

The court attaches no weight to this spreadsheet because its meaning is not readily apparent and was not testified to at trial. The heading "indemnification" could refer to any of numerous indemnification provisions in the Contribution Agreement. PX3. And nothing in this statement refers to a wire transfer of funds.

The total shown on this spreadsheet next to each defendant's name does match the total of two figures in a different spreadsheet, earlier in the exhibit. That sheet, labeled "MPC/TEC Wiring Steps" contains a row labeled "Cash from Balance Sheet (less V&E bill)," with the entry for "DJOT" and the entry for "Troy Campbell" totaling $368,894.74. *Id.* at 6. But DJOT is Lee's and Kindred's separate rental company, which was never an owner of Snubco stock. Given that context, the reference to "Troy Campbell" likely also refers to his separate rental company, TWC. And any money received by defendants as payments of debt owed to their separately owned rental companies, which were run as mere contractors to Snubco, is undisputedly not part of a change in control of Snubco itself. *See* Tr.2 at 218 (plaintiff's attorney: "Those are excluded from that proceed[s]. We are []not[] claiming any portion of their equipment."). In short, those alleged cash transfers have not been proven, by a preponderance of the evidence, to be consideration paid to defendants for relinquishing their ownership of MPC and its subsidiaries (including Snubco).

### 3. Events after the 2018 transaction

A few months after the 2018 transaction, the new TEC holding company changed its name to Axis Energy Services, LLC. DX17. Other changes of form occurred in 2020, allowing plaintiff to seek recovery from all defendants named in the live complaint and not just Lee, Kindred, and Campbell. *E.g.*, DX20, DX23.

#### 4. Contractual definition of a "Change of Control"

Only certain kinds of transactions qualify as a "Snubco USA Change of Control." PX1 at 22. That term's definition is complex and has three, alternative parts.

Part (i) defines a "Snubco USA Change of Control" to mean the consummation of a defined asset transfer:

> (i) the transfer (in one or a series of related transactions) of 50% or more of the consolidated assets of the Snubco USA and its subsidiaries, taken as a whole, to a Person or a group of Persons acting in concert . . . .

*Id.* That definition covers the situation in which Snubco sold the majority of its assets to a third party, even if defendants continued to hold Snubco's stock. The definition would also apply if Snubco's assets were transferred to a different entity (i.e., "Person") owned by defendants themselves.

Part (ii) defines a "Snubco USA Change of Control" to mean a defined transfer of Snubco's equity:

> (ii) the transfer or issuance (in one or a series of related transactions) of securities of the Snubco USA to one Person or a group of Persons acting in concert which as a result of such transaction(s) own 50% or more of the voting power of the then outstanding voting power or equity securities of Snubco USA . . . .

*Id.* That definition covers a situation in which defendants transfer away a majority of their equity or voting rights in Snubco. That is what happened in the 2015 transaction, when defendants transferred 100% of their equity in Snubco to MPC, receiving in exchange cash consideration and equity consideration including about 35% of MPC's Series A-1 units.

Part (iii) is a catch-all category that defines a "Snubco USA Change of Control" to include a broad list of transactions so long as they result in majority voting power in Snubco being held, even indirectly, by persons other than defendants:

> (iii) an amalgamation, merger, consolidation, reorganiza-
> tion or similar transaction involving Snubco USA . . . un-
> der circumstances in which immediately following such
> transaction, a Person or group of Persons collectively own,
> directly or indirectly, a majority in voting power of the
> then outstanding voting power or equity securities of
> Snubco USA . . . other than a Person or group of Persons
> or their respective affiliates who holds a majority interest
> as of the date hereof.

*Id.* Plaintiff invokes this part (iii) as covering the disputed 2018 transaction.

### 5.   Ultimate findings as to breach of contract

Defendants did not pay plaintiff any § 4.1 contingent financial interest on the 2018 transaction. The dispute is whether a payment was required.

The first issue is whether the 2018 transaction was a "Snubco USA Change of Control." It does not meet part (i) of that definition because the court makes no finding that Snubco USA ceased to exist as an entity or that its assets were transferred to another entity, such as the TEC holding company. If a majority of those assets had been transferred out before the 2018 transaction, that transfer itself would qualify as a "Change of Control" under part (i). But the court finds that had not occurred.

The 2018 transaction also does not meet part (ii) of the "Change of Control" definition. Snubco's equity, itself, remained with MPC both before and after the 2018 transaction. The court does find that, as opposed to the snubbing business continued by MPC after its 2015 acquisition of Snubco, the separate BOP-rental business owned by MPC was organized under a different entity. PX8 at 2 (discussing the startup of Momentum Pressure Control Rental, LLC); *see* PX40 at 1 (referring to the "newly formed BOP rental business line within MPC" and its "cost of that equipment that is just now arriving").

- 33 -

As to part (iii) of the "Change of Control" definition, the 2018 transaction was a "merger," "consolidation," or "similar transaction." As found above, MPC and its subsidiaries merged into the new TEC holding company. That transaction was also one "involving Snubco USA," as it was one of the MPC subsidiaries. Indeed, Snubco's snubbing business was the key reason for the merger and consolidation between MPC and TEC. And "immediately following such transaction," a majority of voting control in Snubco was held directly by MPC and indirectly by the TEC holding company (TEC Energy Services) that owned MPC.

The final question is thus whether either MPC or TEC Energy Services is an entity "other than a Person or group of Persons or their respective affiliates who holds a majority interest as of the date hereof." *Id.* at 22. The "date hereof" is the date of the Separation Agreement containing that language: June 17, 2015. *Id.* at 1. As of that date—when the separation from Snubco Canada took effect—the group of persons who held a majority interest (indeed, 100% of the interest) in Snubco were defendants Lee, Kindred, and Campbell. *Id.* at 2, 23. The final clause of part (iii)'s definition thus means "other than [Lee, Kindred, and Campbell]." And both MPC and TEC Energy Services are contractual "Persons" other than Lee, Kindred, and Campbell. So the final clause of part (iii)'s definition is satisfied here.

Notably, part (iii) does not require that Lee, Kindred, and Campbell owned a majority of Snubco's voting power *before* a qualifying transaction. That makes sense in the context of the Separation Agreement, as the defined Net Proceeds of a qualifying transaction are only the proceeds received by Lee, Kindred, and Campbell themselves. *Id.* at 20. If their voting power was merely reduced from a minority share (say 30%) to an even smaller minority share (say 10%), the Net Proceeds received by Lee, Kindred, and Campbell should reflect only that small change. In that way, Snubco Canada contracted for a contingent share of all net proceeds received by defendants from a change of control within

the stated time frame, whether defendants lost control all at once or in stages.

Because the 2018 transaction qualified as a "Change of Control," the next question is whether Snubco was valued as a whole in that transaction above $15 million, on a fair-market-value basis. *Id.* at 21. The court finds that it was so valued. The Lime Rock memo gives MPC's snubbing business an enterprise value of $40 million, while separately valuing MPC's BOP-rental division at $2.7 million. PX40 at 8; *see id.* at 11–13. The deal's closing documents then show that the $40 million enterprise valuation was divided between the snubbing operations themselves ($35,782,449) and defendants' separately owned equipment-rental businesses ($4,217,551). So the court finds that MPC's ownership of Snubco was assigned a fair market value of $35.782 million in the transaction, before subtracting indebtedness (per the contractual definition). PX1 at 21. The credibility of that value is confirmed by the parties' real-world action on it—Lime Rock and B-29 made an eight-figure investment, used to make a large cash-out payment to MPC Holdings. Based on that valuation and a qualifying change of control, the 2018 transaction met the definition of a "Sale." *Id.*

Moving on to the other contingencies for the § 4.1(a) interest, the 2018 transaction fell within the four-year time window for the 10% contingent interest. *Id.* at 5. It was entered into on May 1, 2018, PX3, which is before March 13, 2019.

Lastly, the transaction generated "Net Proceeds" for defendants. The contract defines that term to include the "fair market value of such non-cash consideration" received by defendants in consideration of a "Sale," less certain deductions. PX1 at 20–21. As found above, the fair market value of the TEC equity received by defendants in the 2018 transaction as consideration for their portion of MPC's ownership was $10,292,071.

Although MPC owned both Snubco and the BOP-rental division, defendants' consideration for their MPC equity as a whole qualifies as "Net Proceeds" under the contract. The term "Sale" includes any transaction "involving Snubco" in which Snubco

voting power is majority-held, even "indirectly," by a group other than defendants. PX1 at 22. That broad definition captures even a sale of equity in a parent company of Snubco. And that makes sense in context, because the "Net Proceeds" of such a "Sale" are only the proceeds delivered to defendants. *Id.* at 20 ("any portion of the purchase price or consideration of a Sale delivered to the US Group").

In that way, if defendants grew other pressure-control businesses sufficiently related to Snubco to be sold in the same transaction that both (i) involved Snubco and (ii) resulted in Snubco's voting power being majority-held by others, defendants' own conduct in so organizing the related business would reflect whether it was sufficiently related to Snubco to be covered by the Separation Agreement. That was a sensible way to structure the contract to reflect that defendants were expected to continue to expand the business after the 2015 separation. And, here, both Snubco and defendants' BOP-rental division was held by MPC, which brought both of those pressure-control subsidiaries with it when merging into the TEC holding company. PX3 at 82 (including Momentum Pressure Control Rental LLC alongside MPC as one of the "Group Companies").

Thus, "Net Proceeds" include any portion of the consideration received by defendants on account of any MPC division. Here, that consideration took the form of equity in the new TEC holding company, whose fair market value is noted above. On the other hand, no evidence shows that defendants received cash in consideration of the "Sale." Defendants did receive cash consideration for the assets of their separate equipment-rental companies, DJOT and TWC, but that separate transaction did not result in a defined change of control constituting a "Sale." So that amount is not included in the definition of the "Net Proceeds."

Next, the "Net Proceeds" definition subtracts any proceeds received by defendants that were used to pay either indebtedness in connection with the sale or reasonable expenses of the sale. *Id.* Neither exclusion applies here. The indebtedness here was paid

before issuing (and thus before calculating the value of) defendants' equity proceeds, not using those proceeds. PX3 at 90. And although a law firm was evidently paid $425,000, that payment came out of cash wired at closing by TEC. PX37 at 6. It thus came out of either MPC Holdings' cash consideration or defendants' cash consideration as owners of DJOT and TWC. It did not come out of defendants' equity consideration, which alone has been valued in calculating their Net Proceeds. The court thus finds that defendants' 2018 Net Proceeds were $10,292,071.

Under § 4.1(a) of the Separation Agreement, defendants owed plaintiff 10% of those Net Proceeds, which comes to $1,029,207 (rounded to the nearest dollar). PX1 at 5. That payment was due 90 days after receipt of the Net Proceeds on May 1, 2018, *id.*, which was July 30, 2018. Defendants did not make such a payment by that date and still have not. Accordingly, they are in material breach of § 4.1(a) of the Separation Agreement.

Defendants also failed to give plaintiff written notice of the 2018 transaction, so they did not satisfy their obligation under § 4.1(c) of the Separation Agreement. But that breach could only support damages of prejudgment interest on the § 4.1(a) payment, as prompt notice would at most have put plaintiff in a position to sue for or claim that payment sooner.

The court finds no breach of § 6.7 of the Separation Agreement in 2018 because plaintiff has not pointed to any information that it requested about that transaction to effectuate the § 4.1 payment. In any event, even the alleged breach of § 6.7 would not support damages independent of those for the breach of § 4.1(a).

## II. Conclusions of law

The court now provides its conclusions of law based on the facts found above. To the extent the findings above reflect legal conclusions, those conclusions are adopted here. In any event, although the court's findings of fact and conclusions of law must be entered "separately" from its final judgment, Fed. R. Civ. P. 52(a), no particular form is required for the court's memorandum of

decision. *Tri-Tron Int'l v. Velto*, 525 F.2d 432, 435–36 (9th Cir. 1975) (holding that a court "look[s] at a finding or a conclusion in its true light, regardless of the label that the district court may have placed on it"); *accord Pierre v. Hess Oil Virgin Islands Corp.*, 624 F.2d 445, 450 (3d Cir. 1980).

First, the court has subject-matter jurisdiction under 28 U.S.C. § 1332 based on complete diversity of citizenship and the amount in controversy. Plaintiff is a citizen of Canada. Doc. 28 at 2. Defendants Dirk Lee; Jody Kindred; Troy William Campbell, as Trustee of the Campbell Family Trust No. 4; Momentum Pressure Control Group, LLC; and Axis Energy Services, LLC are citizens of Delaware, Texas, or Georgia. Doc. 104 at 2. The amount in controversy exceeds $75,000.

Second, Canadian contract law applies under the Separation Agreement's choice-of-law provision: "This Plan shall be governed in all respects, including as to validity, interpretation and effect, by the internal laws of the Province of Alberta and the laws of Canada applicable therein, without regard to choice of law principles." PX1 at 11. Under Canadian law, "[a] successful breach of contract action requires '(a) a contract, (b) a breach of the contract, and (c) damages flowing from the breach.'" *Winship v. Stantec Consulting Ltd.*, 2016 ABQB 468, ¶ 105 (Can.) (quoting *Becker Dev. Ltd. v. Alta* (1996), 185 A.R. 20, ¶ 16 (Can.)). Each element has been met here.

When interpreting a contract, the "overriding concern is to determine the intent of the parties and the scope of their understanding." *Creston Moly Corp. v. Sattva Cap. Corp.*, [2014] 2 S.C.R. 633, ¶ 47 (Can.) (quotation marks omitted). A court must "read the contract as a whole, giving the words used their ordinary and grammatical meaning, consistent with the surrounding circumstances known to the parties at the time of [contract formation]." *Id.* The "factual matrix" surrounding contract formation can include "absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man." *Id.* ¶ 58. Those circumstances must be

- 38 -

considered but "must never be allowed to overwhelm the words of [the] agreement." *Id.* ¶ 57.

The court's findings as to breach use all applicable contractual definitions in their ordinary, grammatical meaning. To the extent that a term is not defined in the contract, the court draws on the term's natural meaning in light of the factual matrix surrounding the Separation Agreement's formation.

The court thus interprets the definition of "Sale" to examine how the parties "in" a qualifying transaction themselves valued Snubco on a fair-market-value basis, as opposed to how the court itself might value Snubco at a given time. And the court interprets "fair market value" as the price that a willing buyer would pay and a willing seller would accept, each negotiating at arm's length as disinterested parties, and each seeking the highest and best use of the asset or service in question. *Henderson v. Minister of Nat'l Revenue*, [1973] C.T.C. 636 (Can.); *see generally City of Harlingen v. Est. of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). The court also applies the contract's specific provision that such a valuation is determined "prior to subtracting any fees and expenses associated with the transaction or any Indebtedness." PX1 at 21. Based on those findings, the court holds that defendants breached the Separation Agreement as to the 2018 transaction but not as to the 2015 transaction.

The measure of damages under Canadian contract law is an amount that would restore to the injured party the benefit of its bargain. *Robinson v. Harman* (1848), 1 Ex. C.R. 850 (Can.). In other words, the damages award must place the injured party in the same economic position that it would have occupied had the breaching party performed its contractual obligation. *Strachan v. Barton* (1993), 10 C.L.R. (2d) 142, ¶ 170 (Can. B.C. Sup. Ct.) ("[W]here a party sustains a loss by reason of a breach of contract, he is, so far as money can do it, to be placed in the same situation, with respect to damages, as if the contract had been performed."). Applying that law, the court finds that plaintiff's damages from

defendants' breach of contract are $1,029,207 plus interest on that amount from July 30, 2018, until the present.

Under Canadian law, prejudgment interest on an award of breach-of-contract damages is governed by the Judgment Interest Act, R.S.A. 2000, c J-1, § 2 (Can.). Section 2(1) of that Act provides that "[w]here a person obtains a judgment for the payment of money or a judgment that money is owing, the court shall award interest in accordance with this Part from the date the cause of action arose to the date of the judgment."

That statutory interest authorization is for simple interest. *Id.* § 2(2) (excluding "interest . . . on interest awarded under this Act"). But Alberta courts hold that the Act's authorization of simple interest does not displace any separate, common-law allowance of compound interest. *Alberta (Minister of Pub. Works, Supply & Servs.) v. Nilsson*, 2002 ABCA 283, ¶ 181 (Can.) (holding that "prejudgment interest and [the possibility of] compound interest at common law continue to co-exist with the statutory provisions for judgment interest."). So the court must address Canadian common law regarding compound interest.

At common law, an award of compound prejudgment interest in breach of contract cases is limited to "cases where there is evidence that the parties agreed, knew, or should have known, that the money which is the subject of the dispute would bear compound interest as damages." *321665 Alta. Ltd. v. ExxonMobil Canada Ltd.*, 2012 ABQB 76, ¶ 7 (Can.) (quoting *Bank of Am. Can. v. Mut. Tr. Co.*, 2002 SCC 43, ¶ 55 (Can.)). To the that extent equity plays a role in Canadian courts' consideration of compound interest, it requires review of whether "the defendant traded, speculated, or earned compound interest with the money improperly withheld the profits of which should be justly disgorged, or that the plaintiff would have earned compound interest had the debt been properly paid . . . ." *Nilsson*, 2002 ABCA 283, ¶ 194 (Can.).

The Separation Agreement is silent on either simple or compound interest on any unpaid Net Proceeds percentage. But the contract and its circumstances support the conclusion that

defendants knew or should have known that withholding a § 4.1 payment would prevent plaintiff from earning compound interest. For one, § 4.1's short 90-day time window to deliver the defined percentage of any Net Proceeds shows that the parties understood the time value of money. And Snubco Canada was an ongoing, so-phisticated business clearly interested in putting its assets to their best use through commercial dealings, which is all that compound interest recognizes.

The parties thus either knew or should have known that Snubco Canada would keep its money invested as to earn compound interest (or earn even more in a promising business). Finally, to the extent that equity informs the analysis, the equities tilt in plaintiff's favor because (1) it would have put the proceeds to use earning at least compound interest; (2) defendants themselves had the ability to put the proceeds to the same end; and (3) defendants beached the § 4.1(c) prompt-notice provision that would have allowed plaintiff to claim the payment sooner—a fact also making compound interest an inherent part of the benefit-of-the-bargain damages for the § 4.1(c) breach. *Bank of Am. Can.*, 2002 SCC 43, ¶ 50 (Can.) (restoring prejudgment award from simple to compound interest and recognizing that "[c]ontract law principles may require such interest to be compounded so as to award the plaintiff the benefit of the bargain").

For all of those reasons, the court awards compound interest on $1,029,207 from July 30, 2018, until the present. Interest on that damages award is calculated yearly "at the prescribed rate applicable to that year." *Id.* § 4(2). And the Judgment Interest Regulation, Alta. Reg. 215/2011 (Can.), prescribes those annual interest rates as 0.87%, 2.20%, 1.50%, 0.20%, 0.20%, 3.80%, and 5.15% respectively for the years 2018 through 2024. Applying those figures to the partial year in 2018, the full years of 2019–2023, and the partial year of 2024 through today, the court calculates the final damages award as $1,130,319, which includes prejudgment interest of $101,112.

Section 2(3) of the Act gives the court discretion to (1) refuse to award interest, (2) modify the interest rate set out by the Act, or (3) modify the time period for which interest is calculated, where the court "considers it just to do so having regard to changes in market interest rates, the circumstances of the case or the conduct of the action . . . ." R.S.A. 2000, c J-1, § 2 (Can.). In the alternative, the court exercises its discretion to modify the calculation of prejudgment interest to reach the same result.

Defendants' liability for breach of contract is joint and several among and between them. Canadian law distinguishes between (i) joint liability, (ii) several liability, and (iii) joint and several liability. *Royal Bank. v. King* (1982), 39 A.R. 8 (QB), para. 18 (Can.). "Joint and several liability arises where two or more persons join in making a promise to the same person, and at the same time each of them individually makes the same promise to that same promisee; for instance B and C jointly promise to pay £100 to A, but both B and C also separately promise A that £100 will be paid to him by either B or C." *Id.*

Here, defendants' § 4.1(a) payment is owed jointly and severally. The Separation Agreement entitles Snubco Canada to a percentage of qualifying Net Proceeds, defined as any portion of the consideration for a qualifying Sale that is "delivered to the US Group." PX1 at 20. Snubco USA, Campbell, Kindred, and Lee are all members of the "US Group." *Id.* at 23. And Snubco Canada is entitled to that payment within 90 days of the "US Group, or any of them" receiving Net Proceeds. *Id.* at 5. Because the agreement triggers a single payment obligation for all members of the US Group upon receipt of Net Proceeds by any of them, and because the agreement does not limit the obligation of each US Group member to his, her, or its individually received Net Proceeds, each member of the US Group is jointly and severally liable for the damages set out above.

As to the other defendants named in the live complaint, Snubco USA's liability under the Separation Agreement passed to those successor entities, which now constitute Axis Energy Services

- 42 -

Holdings, LLC. Although the Separation Agreement itself is silent on the matter of successor liability, background principles of law carried forward Snubco's liability to its successor entities. *See* 8 Del. C. § 259(a); Nev. Rev. Stat. § 92A.250(1).

"Under 28 U.S.C. § 1961(a), in diversity cases, post-judgment interest is calculated at the federal rate," even though pre-judgment interest is calculated under substantive law. *Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.*, 288 F.3d 222, 234 (5th Cir. 2002). The federal rate is "equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding" the entry of the judgment. 28 U.S.C. § 1961(a). Post-judgment interest will therefore accrue at the applicable federal rate of 5.024%. Selected Interest Rates (Daily) – H.15, Board of Governors of the Federal Reserve System, www.federalreserve.gov/datadownload/Choose.aspx?rel=H15 ("Format package" button).

Court costs are taxed against defendants pursuant to Federal Rule of Civil Procedure 54(d)(1). As to attorney's fees, Rule 54(d) requires that a claim for "attorney's fees and related nontaxable expense must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Canadian breach-of-contract law is the substantive law. The court finds no substantive law of Canada or the Province of Alberta requiring attorney's fees to be "proved at trial" for breach-of-contract claims. To the extent that the Alberta Rules of Court are substantive Canadian law, they allow costs to be awarded post-judgment: "Unless the Court otherwise orders or these rules otherwise provide, a costs award may be made . . . in respect of trials and all other matters in an action, after judgment or a final order has been entered." Alberta Rules of Court, Rule 10.30(1). *Cf., e.g.,* *Prod. Design Servs., Inc. v. Sutherland-Schultz, Ltd.*, 2015 WL 12743607, at *8–9 (S.D. Ohio July 24, 2015) (finding that the Ontario Rule of Civil Procedure governing attorney's fees is, in part, a substantive law and does not require that fees be proved at trial as an element of breach of contract damages). Lastly, the

- 43 -

Separation Agreement itself does not include attorney's fees as an element of damages for breaches of contract. *See* PX1.

Because attorney's fees are not an element of damages, a "request for attorney's fees must be made by a motion pursuant to Rule 54." *Tech Pharm. Servs., LLC v. Alixa Rx LLC*, 298 F. Supp. 3d 892, 901 (E.D. Tex. 2017). Requests for attorney's fees and related nontaxable expenses may be made by motion within 14 days of the entry of judgment. *See* Fed. R. Civ. P. 54(d)(2)(B)(i).

*So ordered by the court on March 28, 2024.*

J. CAMPBELL BARKER
United States District Judge